Good morning, Your Honors. Susan Alexander with Osramedi on behalf of the Plaintiff Class of Investors. I'd like to reserve two minutes for rebuttal. I think – did we have a moment of cutting time? Yes, we did. We did, okay. Go ahead. This case is about Sienter. The question is whether or not plaintiffs have alleged a strong inference that defendants actually knew that their statements were false when they went to the market on April 12th and said that their second quarter revenues were going to match the record revenues that they had achieved in the first quarter, which had been 420 percent better than the same quarter in the prior year and when they repeated the same forecast on May 17th. There are six groups of facts in the complaint that, when considered in their totality, which the district court failed to do, show that defendants actually knew their statements were false when they made them. There are the witness reports that the slowdown was not just happening to others, internal documents with content satisfying this court's requirement in Silicon Graphics and witnesses explaining them, showing that the defendants knew exactly how bad the business was. There are hard numbers regarding the lost sales from the failed M160 product. There are hard numbers regarding pull-ins from the second quarter that had been brought to the first quarter to achieve the record revenues. Fifth, the insider well-timed sales of $43 million within a week of their April 12th forecast. And sixth, there's the ultimate enormous miss of $100 million in revenues and ultimately 150 percent off the earnings projection. When those six groups of facts are considered together, the complaint raises a strong inference that defendants actually knew that their projections were false when made. I'd like to start with the witness reports. CW29 explained that business at Juniper started going to hell, his words, in the fourth quarter of 2000 and continued into the first quarter of 2001 and the second quarter of 2002. He was the former Juniper Global Operations Manager. Defendants agree, concede in their brief, that there's a basis for his knowledge about the company. He attended weekly meetings. He received weekly reports on the financial status of Juniper. Isn't it business is going to hell? Well, yes. He says business is going to hell. Well, CEO Kreens also says things – Business could be going to hell because, you know, you're going to make a big profit, but not as big a profit as you thought you might. Some people say that's business going to hell. Well, CEO Kreens also said things are going down internally, and then he went to the market and said we're as strong as we've ever been. So, yes, those are statements that don't quantify numbers, but we also have quantified numbers in the complaint because the M160 product had accounted for 40% of Juniper's revenues since its introduction in 2000, and that product was supposed to be – it's a router. It's supposed to carry information through a network. It was dropping information packets, and the complaint alleges $80 million worth of lost sales attributable to the M160 product problem. The whole miss is $100 million. So that's a hard number that accounts for a substantial amount of what we're talking about here. And what's important there in terms of Sienta is defendants never admitted the M160 product problem until a full year later when they had a different product that they thought would fix it. So they have this router. Who are they supposed to admit it to? Well, here's what happened. They have this router that's supposed to be carrying information along the network. It's dropping the information packets. They have two competitors, Avicii and Cisco, and we have witnesses both from within Juniper and also from Avicii and Cisco who've said, we were stealing all this business from Juniper. We were winning contracts. We got $80 million worth of business that would have gone to Juniper, and we got it instead because they had this faulty router. So rumors start to circulate in the industry that maybe Juniper has a problem with the M160 product, which is their central core product. And on November — Are you faulting them for not? Are you betting the rumors by not coming out and saying, yep, they're right? I'm faulting them for lying to the market because they were explicitly asked. And in November, Director of Production Management Brian Brown said, we basically don't have any problems with the OC192 cards, which is the card inside that router. I'm not sure where that's coming from. They were asked again in December. On December 5th, Juniper said, there's nothing wrong with the OC192 cards. It has not impacted customer buying decisions. And so, yes, I am suggesting that when the complaint is considered in its totality, the fact that the defendants were willing to lie about the M160 product, even on June 8th, when they ultimately admitted the $100 million miss, and they eventually in July had to come forward with 150% less in earnings than what they had projected, they still never admitted that it was related to their M160 product problem. Even at that point, they said, well, it looks like the market got to us. It seems to be affecting all of the customers. There's a little bit, you know, sales are down a little bit from everybody. Even though they had said the slowdown is affecting the market, but Juniper is as strong as we've ever been. But when they admitted that the slowdown was affecting Juniper, they still denied that it had anything to do with the M160 product problem until April of 2002, a full year later, when they had a different product. They had the T640 router. At that point, they said, now we have a new product. It doesn't drop the information, and that's critical. It's critical that a router be able to function without dropping information products. So, yes, I am suggesting that the fact that they were willing to lie about the M160 product and deny there was a problem when they knew that they were losing $80 million worth of sales because of it is part of the scientric consideration to be considered together with 22 witness reports and the internal documents. For example, one of the best internal documents is this June 11th memo. So the way Juniper worked. I'm feeling a little difficulty with the proposition that in order to avoid liabilities and securities laws, you have to trash your own product in the market. I mean, you know, as you know, as we learned a few years back, processors, computer processors all make errors. That's absolutely right. The question is not whether they make errors. The question is at what rate they make errors and how significant the errors are. You know, one of the floating decimal error that the Intel processor. And so businesses, in sort of trying to be competitive, trying to remain competitive, will minimize those errors. Not in trying to be competitive in selling stock, but in selling product and not losing customers, you know, maybe sometimes rightly, sometimes wrongly, they try to minimize those errors. As I understand the M160, it dropped packets, but it dropped packets rarely. I mean, that was one description. Somebody said rarely, but we have hard numbers in the complaint that say they lost $80 million worth of sales because of this. I'm not saying they have to take out ads in the newspaper. I understand, but losing sales and using packets are very different concepts. They're completely related. The reason they lost sales might have to do with the fact that people blew out of proportion the degree of packet loss. There's no router that loses no packets at all. Over the long run, all of these computer things, all of the connections lose packets. Network connections lose packets. That's why you have redundancy in the system. Packets get transmitted, and there is a check to make sure they arrive. I don't know how this all works, but it's all based on an assumption that there is a certain amount of packet loss. And if you, as a matter of securities law, have to essentially go out there and put the worst possible case face on your product, then that sort of exacerbates the problem. Yes, but that's not at all what we're arguing here, and that's not what the complaint alleges. If you'll forgive me, it sort of sounds like that's what you're arguing. They didn't come out and say, you know what, the M60 is really a terrible product, and we're surprised our customers don't go to Cisco and our other competitors more frequently. You're right. We think they're fools. Yes, they didn't say that. But they also didn't say what they should have said, which is we have a product that we believe in. It works in these situations. We are experiencing problems with it in these other situations. We are confident we can fix those problems, and there may be a slight reduction in sales temporarily until we fix it. That would have been the truth, and that's not what they said. What they said is we don't know what you're talking about. There is no problem. And they made estimates about revenues and earnings that did not account for $80 million in lost sales. They did significantly lower their earnings forecast. They lowered an annual forecast, but they said in the short run, we're going to match the record revenues we achieved in the last quarter, and we are as strong as we've ever been. That last quarter was 420% better than the same quarter the prior year. It was an extraordinary quarter for them. So saying that they were going to be flat with that was great news, which is reflected in the market's response, which Judge Easterbrook in Asher v. Baxter says you consider as part of understanding the statement that was made to the market. The market responded by bumping the stock up over 60% in the first week after the April 12th statement. It was not heard as a conservative statement. It was absolutely heard as great news. It looks like I'm. Thank you. We'll hear from opposing counsel now. Thank you, Your Honor. May it please the Court. My name is Nikki Locker, and I represent Appellee's Juniper Networks and Mr.'s Preens, Ghani, Wexler, and Haley. Counsel is correct. There is one question on this appeal, and that is whether plaintiff's complaint pled with particularized facts a strong inference of Scienter. Here that the defendants knowingly gave false revenue and earnings guidance for the second quarter of 2001. That is that they actually knew the guidance was false at the time they gave the guidance. I'd like to address two points and then go to the M160. First, in this case, it is not enough for the plaintiffs to merely allege that Juniper was facing a slowdown, that there was a slowdown in the company's sales. Here at the start of the class period, Juniper told the market that its business was slowing down when it reduced its fiscal year guidance after meeting its and the analyst's expectations for the first quarter. When it told the market it was reducing the fiscal year guidance because customers had trimmed spending. When it told the market that visibility was limited, and when they told the market that it would be harder than ever to deliver positive results given the difficult market conditions the company was facing. Let me correct one comment by counsel, who said that Mr. Kreins stated to the market, we are as strong as ever. What Mr. Kreins actually said to the market was the following, and this is in the excerpt of record at page 132. On a relative basis, meaning measuring Juniper relative to its peers or competitors, we're as strong as we've ever been. The complaint doesn't have a single allegation regarding Juniper's competitors and how they were faring, whether it's Cisco or Nortel, compared to Juniper. Indeed, what you find in the record, for example, and this is at — this deals with the turndown of economic conditions problem, and I guess what the claim there is, you know, we're holding our own in a sinking market, is what you could read. This is corporate talk. On a relative basis, we are as strong as ever. That sort of corporate talk is saying, you know, we're all — business is going to hell for everybody, and ours is not doing any more poorly than anybody else. That's exactly right, Your Honor. I guess it's sort of a — That's exactly right. But there was also the problem with the fact that, in addition to all that, they were losing market share to their competitors that, in fact, they were not doing as well as that. They're not holding their own, but they had a product that, for better or for worse, was being impugned in the market, and competitors were going — I'm sorry, customers were abandoning the product for those competitors. Let me then address the issue of loss of market share, and then I'm going to go directly to the M160. Actually, the complaint does not allege that Juniper lost market share to its competitors. It does not allege a single loss deal to Cisco, who, of course, was the 900-pound gorilla in the industry, as opposed to Avicii, who was negligible at best. The analyst had projected $9 million in sales for Avicii for Q1 of 01, which is the time period we're talking about. But what the complaint does allege, and this is at Supplemental Excerpt of Record 422, an analyst report dated in April 24 of 01, right after the start of the class period, Juniper's M-class of Internet routers — that's their series, the M-classes, M10, M20, M160, M40, and so on — attracted such widespread acceptance among ISPs, Internet Service Providers, and web hosting companies, that the company grabbed more than 33% market share of the Internet backbone router market, basically the whole router market, with much of the gains coming at the expense of Cisco. That's what the complaint alleges, not a loss of market share. Ms. Locke, you started off by saying the issue was whether they pled Cyanter with specificity. Are you — I'm sorry, your honor? You started off by saying that the sole issue was whether they pled Cyanter with the requisite specificity. Yes. Are you then acknowledging, or do you concede that they pled falsity with the requisite specificity? Absolutely not, your honor. Well, why isn't that also a key issue here? That is a key issue. The Ninth Circuit under Ronconi and Vantive have it as a single inquiry. That is, under Ronconi and Vantive, falsity in Cyanter is one inquiry, and the standard is pleading a strong inference of particularized facts giving rise to a strong inference that the defendant knowingly gave false revenue and earnings. And what the Ninth Circuit has said is because of the strong inference standard under the Reform Act, it actually raises the pleading bar for falsity also. But it's one inquiry. I understood the district judge to rule that they didn't plead falsity, that the statements made were, in fact, false when made. The judge also found not only lack of falsity but lack of Cyanter. Right. Correct. And I would agree with that. And the basic thrust is that in a case where the defendants told the market we're facing a slowdown, what the plaintiffs have to do is show more than simply a slowdown. And while their confidential witnesses speak to reduced forecasts or reduced orders and perhaps one lost deal in the first quarter, but basically a reduction in forecast by customers in February and March, that is not information that's necessarily inconsistent with a forecast for flat or possibly declining revenue in light of a reduced guidance. And indeed, not one confidential witness identified any information that was known to him or her, much less the defendants, that was inconsistent with the guidance. That is, that indicated that Juniper needed to reduce its guidance even more than it did. And let me just address the M160s for one moment, but I did want to address one other point. I would ask the Court to look very carefully at what the complaint says about the M160s, because it does not support the assertion that it alleges $80 million in lost sales due to the M160. They're all hard numbers, but it doesn't allege what Plaintiffs' Counsel says it alleges. A couple of points. First. What do they allege? What they allege is, one, they allege that it doesn't drop data, that it actually reorders data, and that is that Paragraph 74, 76, and 78 of the complaint. Two, they actually allege in their own complaint that it was a rare condition and that it only occurred under specified conditions, and that's at Paragraph 77, 78, and 88. Three, they actually allege that the M160 product, notwithstanding the fact that it had this reordering problem, drove Juniper's financial success in the year 2000. I don't know how you reconcile the fact that it accounted for 40 percent of the company's revenue in year 2000. That's a year in which revenue grew 550 percent. It drew the success, but somehow defendants should know that that product is all of a sudden going to fail in the market. Three, let's talk about the hard numbers, the supposed $80 million in lost sales. There's no allegation in the complaint that Juniper lost any sales to Cisco. So the allegation, there's one allegation, and this appears at Paragraph 96. That's what they cite, Paragraph 96 for the proposition that Juniper lost $50 million in M160 sales to a company called Avici. What the complaint actually says at Paragraph 96 is the following. That in early, I'm sorry, according to a witness, which is CW1, he doesn't say what his basis of knowledge is. He was a hiring manager in Denver. That in the year 2000, Juniper sold $60 million of product to Level 3. Not M160s, just product. And that in early 2001, the, quote, annual purchase fell to $10 million. That's what that paragraph says. That does not show a lost sale of M160s. It doesn't even show a lost sale, and it certainly doesn't show a lost sale to Avici because of a reordering problem. That's Paragraph 96. That's $50 million of the $80 million. By the way, their own complaint, and this is at Excerpt of Record 149, says that a year after the class period, Avici had had only two customers in its entire existence. Neither one of which was Level 3. Neither one of which, by the way, was either France Telecom, the other company that Juniper supposedly lost M160 sales to, to Avici. And that's Paragraph 96 also. So that's another $2 million on top of the $50. Let's go to the last $25 million of supposed lost deals due to this M160 problem. That appears in Paragraph 93. In Paragraph 93, where the complaint alleges is that Avici won a $25 million contract from Quest in the first quarter of 2001 that, quote, might have otherwise gone to Juniper. This paragraph doesn't allege it actually impacted Juniper sales to Quest in the second quarter. It doesn't even allege that Juniper was relying on this one sale to make its Q2 numbers, and it certainly actually suggests the contrary, since if this was a lost deal, it was lost in February before the company reduced its guidance in April. So that's what the hard numbers are that Plaintiff's counsel is referring to. I'd like to, if I may, make one other point about Plaintiff's argument to this Court. It relates to the 12b-6 inference, that is, drawing inferences in favor of Plaintiffs. Much of Plaintiff's argument to this Court, indeed most of their argument, relies on requesting that the Court draw inferences in Plaintiff's favor. And with respect to allegations that Plaintiffs actually identify themselves as their key allegations, what the Plaintiffs ask the Court to do is actually infer facts that they failed to plead. And that request would circumvent the Reform Act's requirement that allegations that are pleaded on information and belief be plagued with particularity. And there's many examples of this throughout. Thank you. I'm sorry? Your Honor's time. Thank you. Okay. Thank you, Your Honor. Thank you. Your Honor's time as well. Would you like a minute for rebuttal? Thank you. I'd like to point the Court to two witnesses and one document. CW-29 said that based on the weekly reports, he knew that defendants who also saw those same weekly reports knew that they couldn't make the second quarter forecasts. CW-15 said that even after Juniper adjusted the forecast downward, the annual forecast, Juniper still failed to adequately disclose the true slowdown taking place at Juniper. And the third item I'd like the Court to consider is the June 11th email, which shows that 10 weeks into a 13-week quarter, Juniper was at 43 percent of their sales goals. The analysts and everybody who looked at that afterwards said there was no way to have been looking at those numbers on a weekly basis and believe that Juniper could achieve the numbers they were forecasting. Thank you, Your Honors. Thank you. Cautious argument stands submitted. We'll next hear argument in the next case on the calendar, which is Zylock v. Corning et al. Thank you. Don't both get too comfortable. Mr. Rossman? Yes, Your Honor. Before you get started, Mr. Rossman, are you familiar with Federal Rule of Appellate Procedure 32 and the requirements of typeface requirements? Are you familiar with the need to file a certificate of compliance with your brief? Your Honor, at this point, no, I'm not. I would have to go back and look at that. I have no indication that there is. Do you have your brief there? Yes, I do. And do you have your reply brief there? Yes, Your Honor. Okay, now take your reply brief and look at the page following conclusion. Is your certificate of compliance? Yes. Okay. You don't have a similar one in your main brief, and if you look at the typeface on your main brief, it is not 14-point type as required by our rules. I notice you admitted Pro Hac Vitae to this Court. That's what it says on here, Pro Hac Vitae? I was admitted Pro Hac Vitae below, Your Honor. I have been previously admitted to the Ninth Circuit. Okay. Now, you understand the need to comply with our rules? Yes. Okay. Your main brief doesn't follow Rule 32. It doesn't contain a certificate of compliance. And, in fact, the type is smaller than our rules require. I understand that we have a reason for these rules. We actually have to read the briefs, and you're not doing your clients a favor by presenting a brief that doesn't comply with our rules. I appreciate that, Your Honor, and I certainly apologize. And you understand that when you filed your reply brief and you noticed that you needed a certificate of compliance, you had a responsibility to bring your main brief into compliance with the rule that you then discovered. We should have, Your Honor. I think the ‑‑ I was never aware of the issue. If I had, yes, I'm sure of that. Well, you signed this certificate of compliance, Mr. Grossman. It's your signature. On the reply brief. Yes, Your Honor. Okay, so at that point you realized that such a thing is required. We did. My office did realize that it was required and should have realized it with the opening brief as well. I don't think it registered at the time that we filed the reply brief that the opening brief was not in compliance. Well, at least you didn't misspell the name of your own law firm on the front page of your brief, as your opponents in counsel did, so I suppose. Yes, he did, and he pointed that out to me shortly before the hearing, so I apologize again, Your Honor. I don't think it's funny at all. I think if ‑‑ does Mr. Levin know that his name appears on a brief with misspelled where his law firm name is misspelled? I do not know, Your Honor. You will bring this to his attention. Yes, Your Honor. And let him know that I'm disappointed that he allowed a brief to stand in our court where his name appears with a misspelling of his own firm's name without making any effort to substitute it and remove it.  You might also look on page 10 and look for the wrong date that appears there. I must say I was disappointed in the care with which counsel on both sides. Page 10? There's a reference to January 4th, 2000. That is an error. My apologies, Your Honor. It's not a question of apologizing. It is a question of professional responsibility to your clients for which counsel get paid fees, and although it is not pleasant for us to have to go through briefs that don't comply with the rules and have material errors that we have to sort out, you're really not performing your responsibility. And if you think it is funny that you present a brief with your own law firm's name misspelled on the front cover, that you jerk with opposing counsel, it is something that you should have been embarrassed about and done whatever possible to correct or to avoid having presented to the court. And I hope you will mention this to Mr. Levin. I know him well and have for many years, and I think you should tell him that I'm disappointed in the performance in this regard. I will, Your Honor. Thank you.
judges: Kozinski, Silverman, Benitez